

# United States District Court

# Eastern District Of New York

Joseph Gentile,

Petitioner,

Against

Rolland Larkin, Superintendent,

Eastern N.Y. Correctional Facility,

Respondent.

ORIGINAL

CV 12 - 0055

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 03 2012 ★

BROOKLYN OFFICE

TOWNES, J.

---

## PETITION FOR HABEAS CORPUS RELIEF

## 28 U.S.C. § 2254

---

Joseph Gentile, pro se
Eastern Correctional Facility
P.O. Box 338
Napanoch, N.Y. 12458

Petitioner was charged in Supreme Court, Queens County, with Rape in the First Degree (P.L. § 130.35[1]), Kidnapping in the Second Degree (P.L. § 130.20), Assault in the Second Degree (P.L. § 120.05[2]), Unlawful Imprisonment in the Second Degree (P.L. § 265.01[2]), and Unlawful Possession of a Loaded Shotgun (N.Y.C.A.C. § 10-1310-H[1]).

These charges arose from a July 29, 2005 incident wherein it was alleged that Petitioner drove in a cab to the home of his ex-girlfriend, while carrying a gun, grabbed her, and pulled her into the cab, where a friend was waiting with a shotgun, and took her to his house. Petitioner then, allegedly, raped the ex-girlfriend at gunpoint, and burned her with a cigarette.

Judgment was entered after a jury trial, on January 3, 2007, before Justice Richard L Buchter, Supreme Court, Queens County. Petitioner was found guilty of Rape in the First Degree (P.L. § 130.35[1]), Assault in the Second Degree (P.L. § 120.05[2]), Criminal Possession of a Weapon in the Fourth Degree (P.L. § 265.01) and, Unlawful Possession of a Shotgun (N.Y.C.A.C. § 10-1310-H[1]). Petitioner was sentenced to Eighteen (18) years imprisonment.

Petitioner appealed to Appellate Division, Second Department, and his conviction was affirmed. See People v. Gentile, 73 A.D.3d 944 (2010), lv. denied, People v. Gentile, 15 N.Y.3d 851 (2010). Petitioner did not seek a writ of Certiorari from the United States Supreme Court. His conviction became final on December 27, 2010.

### Facts

In April 2005, twenty-four-year-old VASHTI PERSAD became romantically involved with petitioner and moved into his house in Queens County. On July 29, 2005, while at her parents' house in the Bronx, Vashti told petitioner over the telephone that she did not want to be with him anymore. Petitioner responded that if she did not comeback to his house, he would send people to kill her family.

1

At approximately 8:00 p.m., petitioner, carrying a .45 caliber pistol, and PETER DIPIANO, carrying a shotgun, took a cab to Vashti's parents' house. When they arrived there, Vashti was sitting on the porch with her younger sister, VEERA PERSAD, and her younger brother, ANIL PERSAD. Petitioner stepped out of the car, called Vashti a "whore", and accused her of sleeping with the neighbors. Veera and Anil told Vashti to get rid of petitioner because their father was inside, so Vashti approached petitioner. Petitioner grabbed her by the wrist, dragged her next-door where some neighbors were barbecuing, and, waving his gun, and screamed, "You better not touch my girl you fucking niggers."

Petitioner then pulled Vashti into the cab, where Peter Dipiano was waiting with a shotgun on his lap, and they drove to petitioner's house. There, Dipiano placed the shotgun in a closet, while petitioner pulled Vashti into the kitchen. Vashti told the petitioner numerous times, that she needed to go home, but petitioner ignored her pleas, so Vashti slipped into the bathroom, called Veera and told her that she thought petitioner was going to kill her, and that she could call the police ion she did not hear back from her shortly.

When Vashti persisted with her pleas to leave, petitioner became angry, hit her, called her a "dirty whore", dumped food on her, and pointed his gun at her. Petitioner then grabbed Vashti's wrist, dragged her into the laundry room, pulled down her jeans, pushed her up against the washing machine, and forced his penis into her vagina. Vashti, who weighed 90 pounds, attempted to resist by screaming, crossing her legs, and pushing against him, but petitioner, who weighed 195 pounds, overcame her resistance and placed his hands over her mouth.

After petitioner raped Vashti, they returned to the kitchen where petitioner smoked a cigarette and told Vashti that she was causing him pain, and that she needed to know what pain felt like. He then pointed his gun at her, and repeatedly burned her wrist with his cigarette,

2

causing her to yelp in pain. Meanwhile, Peter Dipiano was in the living room smoking marijuana with his friend Carlos, and while he heard "signs of struggle" coming from the kitchen, neither he nor Carlos came to Vashti's assistance.

Shortly after Veera Persad received the call from Vashti stating that she believed that petitioner was going to kill her, she called the police. Police Officer JOHN FAIVUS responded to petitioner's house with a rookie police officer. Peter Dipiano opened the door and immediately slammed it shut. Dipiano then ran into the kitchen, told petitioner that the police were there, and petitioner gave Dipiano the .45 caliber gun to hide.

Petitioner then opened the front door, stepped outside, and closed the door behind him. He was combative, and would not let officer Faivus into the house. Officer Faivus directed petitioner to bring Vashti outside, and when she came outside, Officer Faivus observed that she was upset and not fully coherent. When petitioner stepped away, Vashti stated to Officer Faivus under her breath, "do not leave me here, do not go."

Officer Faivus then placed Vashti in the back of his patrol car and took her to the 114th precinct. He asked Vashti what happened, but she was crying and in too much of a panic to say much. She just stated that petitioner almost shot her in the head. She did not tell Officer Faivus what type of gun petitioner had used.

At the precinct, Officer Faivus placed Ms. Persad in an interview room. He did not believe that there were any female officers around to interview Vashti, so he summoned Police Officer Mike Tice from the anti-crime unit to assist him. However, when they attempted to interview Vashti, she became distraught and began to cry and shake, so Officer Faivus left the room and let Officer Tice take over the interview. Vashti told Officer Tice that petitioner tried to

shoot her in the head. She never claimed that the gun he held against her was a shotgun, but she did say that there was a shotgun in the house.

Vashti did not tell Officer Faivus of Officer Tice that she had been raped and burned with a cigarette because she was too embarrassed to disclose such information in "a room full of men", was in a panic, and her primary concern was that petitioner had placed a gun to her head and almost killed her. Officer Faivus noticed a small circular burn mark on Vashti's wrist, but never called for an ambulance. His superior, Sergeant Khoreshi, instructed him to let the detective squad handle it and Officers Faivus and Tice drove Vashti home.

At approximately 11:30 p.m. on July 30th, Vashti's mother, DOEKIE PERSAD, came home from work, went downstairs, and found Vashti lying in bed crying. Doekie held Vashti's hand, at which point she noticed burn marks on Vashti's hand and bruising on her shoulders. According to Doekie Vashti was to distraught to explain what happened, so antibiotic was placed on the burns, and she was taken back upstairs.

On August 1st, Doekie found Vashti crying again, so she pleaded with Vashti to explain what happened. Vashti responded that she had been raped, but did not want to talk about it. She further told Doekie that she made a complaint to the police and Doekie urged her to follow-up with the complaint.

Later that day, Vashti went to the 114th precinct, spoke to Detective GARY O'CONNOR, who, upon learning the severity of Vashti's complaint, requested that Sergeant Ramos of the Intelligence Unit assist him in interviewing, and obtained the original "UF-61" complaint report from the night of July 29th. Vashti was upset, but Detective O'Connor calmed her down, and was able to elicit from her a complete account of the incident. Vashti stated that she had been raped and burned with a cigarette. Detective O'Connor observed and photographed the burn-marks on

4

Vashti's wrist and Vashti turned over to him the jeans she had been wearing when she was raped. Detective O'Connor did not ask Vashti whether she failed to mention anything about a .45 pistol when she spoke with the police on July 29th or if her account of the incident had changed since then, and he did not ask her why she did not mention being raped and burned with a cigarette that night.

After interviewing Vashti, Detective O'Connor and the other police officer's went to petitioner's house to apprehend him. Upon entering the house, they found that petitioner was not there and that the house was in shambles, with dog feces, paper, and clothing scattered everywhere and three pit bulls roaming free. Detective O'Connor recovered a loaded shotgun from inside the house, which Vashti identified as the gun Peter Dipiano was holding in the cab on July 29th.

On August 4th, petitioner was apprehended inside the apartment of a Mr. Antoine on Astoria Boulevard. When Detective O'Connor advised petitioner of the charges against him, petitioner stated that he threw the ".45" that everyone said he had into a river near Astoria Park.

In October 2005, Detective AEDEAN MCCLUSKY, an expert in ballistics testing with the Firearms Analysis Section of the New York City Police Department tested the shotgun and ammunition found in petitioner's house and found both to be operable.

On November 9, 2005, MARK DESIRE, an expert in forensic biology and DNA testing with the office of the Chief medical Examiner of the City of New York, supervised the forensic examination of the jeans that Vashti Persad had turned over to the police. Two bloodstains and three semen stains were found in the inside crotch area of the jeans. DNA tests revealed that the blood was Vashti's and the semen was petitioners. It was impossible to determine through DNA testing how and when the stains were produced, but, in all likelihood, the jeans were not washed

5

after the stains were produced because washing the jeans would have caused the biological material to come off.

According to Dr. DOM LEWITTES, an expert in forensic psychology, Rape Trauma Syndrome is an outgrowth of studies that numerous professional in Mental Health have performed documenting the different and unique ways that victims react to the trauma of sexual assault. These studies have revealed that people who have not experienced the trauma of sexual assault or rape tend to lack an understanding of the unique ways in which a female may react to the specific trauma of rape and while it is common for a rape victim to react in an expressive manner and immediately report the rape and seek help, it is just as common for a rape victim to "go inside" herself and not report the rape to anyone. This type of reaction is attributed to feelings of humiliation, shame, embarrassment, fear, and of being overwhelmed as a result of the traumatic rape experience.

Moreover, a female rape victim is more likely to disclose to a female who she trusts in private, rather than to a group of males. However, some rape victims, because of the overwhelming emotional trauma caused by the experience, are never able to reach a more expressive stage, and never report the rape to anyone including family members. Additionally, a victim who is raped by a person with whom she is in a relationship, may experience emotional conflict, because she has had both positive and negative experiences with the person, which may affect her "comfortability" to disclose the rape to anyone. Furthermore, a female who has been subjected to physical trauma in addition to sexual trauma may find it even more difficult to talk about the experience because the pain the victim has suffered adds to the feeling of fear.

6

**Petitioner's Case**

On July 4, 2004, his girlfriend, Vashti Persad, told petitioner Joseph Gentile, a music label owner with a criminal record, that she was pregnant. He was elated, but then did not hear from her for several weeks after that, despite the fact that he called her twice or more each day and left her messages.

Finally, on the evening of July 29th, Vashti called him from her mother's house in the Bronx and asked the petitioner to come pick her up because the neighbors had threatened her and she was afraid to leave the house. She claimed that when she called the police the neighbors pulled out a .38 caliber gun on her.

Petitioner then told Peter Dipiano to retrieve his 12-gauge shotgun, which petitioner's ex-wife had given petitioner as a gift, and he called a cab. When the cab, driven by SHEIKH WAHEED, arrived, petitioner and Dipiano got in and petitioner instructed Waheed to drive to Vashti's parent's house. Petitioner was not carrying a .45 caliber pistol and, while Waheed saw that petitioner was holding a shotgun, he did not know if it was real. Waheed had driven petitioner on prior occasions and he liked petitioner because he tipped well.

Waheed became lost, so petitioner called Vashti and had her give Waheed directions. Vashti did not tell him not to come. When they arrived, petitioner jumped out of the cab and confronted the neighbors about threatening Vashti. When Vashti came out of the house, he told her not to worry because he was "behind the twelve gauge". Petitioner then resolved the dispute with the neighbors and thanked them for "being peaceful about this".

Vashti wanted to spend the night at petitioner's house, so they drove there in the cab. Vashti appeared happy to Waheed. When they arrived at petitioner's house, Vashti led petitioner

7

into the laundry room; where they had sexual intercourse standing up. Petitioner's legs became tired, so he propped Vashti's back up against the washing machine.

When they were finished, petitioner turned on the light and observed four hickies around Vashti's breast. Petitioner had never kissed her there so he believed that Vashti had cheated on him. When petitioner confronted Vashti in the kitchen, she confirmed "with a smile" that she had cheated on him, and told petitioner, "You know, it is what it is." Petitioner called Vashti a "filthy whore", and told her he had just acquired Motown documents and that she would not be sharing life with him. He believed that Vashti had purposely become pregnant so that petitioner would be forced to support her financially and that the baby was not his.

Petitioner then told Vashti to call her sister to come get her out of his house, and he went to the living room to cool off. When he returned to the kitchen the doorbell rang and Dipiano, who had been in the living room smoking marijuana with a "kid" named Carlos, came inside and told petitioner that the police were there. Petitioner went to the front door, saw police officers Faivus and McClusky standing there, so he stepped outside. Officer Faivus told petitioner that there had been a report of domestic violence there, which petitioner denied. He then directed petitioner to bring out Vashti. On the way to the door, Vashti began crying and when she stepped outside, she ran to Officer McClusky and stood by him as if she was petrified of petitioner. Petitioner then turned to the police officers and stated, "Take that bitch out of here". Officer Faivus brought Vashti to the 114th Precinct and asked Police officer Mike Tice to interview her. In the interview room with Officer Tice were Officer Faivus, Officer Mike Warren, Sergeant Khoreshi, and Officer McClusky, who had just graduated from the Police Academy and "had no idea what he was doing". Officer Tice did not believe there were any female police officers working that night. Vashti was crying and reluctant to speak, so Officers

8

Favius and Warren, and Sergeant Khoreshi, left the room to make her feel more comfortable, leaving only Officer Tice, and Officer McClusky with Vashti. Officer Tice conducted the interview, while Officer McClusky just listened.

Vashti told Officer Tice that petitioner and Dipiano had come to her house in the Bronx with guns, brought her back to petitioner's house, and would not let her leave. Vashti did not indicate that she had been raped or burned with cigarettes, but Officer Tice did notice burns on her wrist that appeared "very fresh".

After the interview, Officer Tice told Sergeant Khoreshi that he thought Vashti was in need of medical attention, and, based upon what Vashti told him, he believed he should go back to petitioner's house. Sergeant Khoreshi told Officer Tice to leave it to the detectives and did nothing. Officer McClusky drafted the UF-61 complaint report, which Officer Tice did not review for accuracy.

## Petitioner's Version of Events

Petitioner obtained his corporate seal in 2002 for a record label and was in negotiation with Motown Records, when he met Vashti Persad. Soon after, they became romantically involved, and she moved into his home.

On July 4, 2005, about three weeks before the alleged incident, Vashti informed petitioner that she might be pregnant. After spending the day together, she visited her parents in the Bronx. The following day, petitioner telephoned her and left a message for her to let him know if she "wanted to have the child." Growing increasingly concerned about the pregnancy and her whereabouts, he called numerous times, but did not hear from her until July 29th. When she contacted him, she informed him that she was at her mother's house in the Bronx, and would be "over in a few minutes".

A few minutes later, however, she called and asked petitioner to pick her up because her drug-dealing neighbors' were threatening her family with a .38 caliber gun. Petitioner initially asked Vashti if she had called 911, she responded "yes", but that it was to no avail. Petitioner then told his friend, Peter DiPiano, to retrieve his 12-gauge shotgun from the closet. Petitioner and DiPiano then took a cab, driven by Sheikh Waheed, to the Bronx.

Unfamiliar with the Bronx, petitioner, using the driver's cell phone, called Vashti for directions. When they finally arrived, petitioner confronted Vashti's neighbors, and quickly resolved the matter peacefully.

At petitioner's request, DiPiano called Vashti and told her to come out of her parent's house to the cab. She voluntarily entered, and returned to petitioner's home. At the house , DiPiano went upstairs, put the shotgun away, then joined a "kid" from the neighborhood named Carlos in the living room. There, they smoked marijuana.

Petitioner and Vashti had consensual sex in the dark laundry room adjacent to the kitchen. Petitioner was initially standing upright, holding Vashti face to face, but then "propped her up against the washing machine". Thereafter, petitioner turned the light on, and noticed three or four hickeys on her body. Feeling hurt and angry, petitioner was determined to end the relationship.

Petitioner then called Vashti a "filthy whore" and said the he deserved "a lot better than her". Upon confronting her about her infidelity, she confirmed having sexual relations with someone else, so petitioner told her to call her sister to "get [her] out" of his house. He told her that he wanted a paternity test to resolve whether he was the father of the child, because he thought she might want to have the child for financial gain.

10

After Vashti made the call, the doorbell rang. Two Police officers' were at the door. Petitioner spoke to an officer Faivus, and, upon request to see Vashti, brought her to the door. Vashti suddenly began to cry. Petitioner then asked officer Favius "please do [him] a favor. Why don't you drive her home because I can't even look at her anymore." Faivus then left with Vashti.

The next morning, petitioner spoke to Vashti on the telephone. Crying, she informed him that he "might" not be the father of her baby and thought "maybe it was better that [she] abort the child." Petitioner agreed with her and hung up the phone.

## **ARGUMENT**

Section 28 U.S.C. § 2254(d) provides that a state prisoner's application for writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state-court proceedings unless the adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States;" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." [1] A district court or Court of Appeals can no longer look to lower federal-court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. Id. However, it is equally clear that the federal court is to make its own dependant judgment on whether the state-court decision is contrary to federal law or an unreasonable application of that law. Id.

The Supreme Court has made clear that the "unreasonable application" clause of the federal habeas corpus statute applies when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts

---

[1] Williams v. Taylor, 529 U.S. 362 (2000).

of the prisoner's case; whether a state court's decision was an unreasonable application of legal principle must be assessed in light of the record the court has before it.  For purposes of the AEDPA's limitation on habeas review of state-court determinations, "clearly established federal law" refers to holdings, rather than <u>dicta</u>, of the United States Supreme Court as of the time of the relevant state-court decision.  In a number of cases during the last five years, the Supreme Court made clear that an "unreasonable application" of clearly established Supreme Court precedent means more than simply that the federal habeas court concludes in its independent judgment that the state court decision applied a U.S. Supreme Court case incorrectly; rather, a habeas petition must show that the state court applied the Supreme Court's ruling to the facts of the case in an *unreasonable* manner.[2]

With respect to the state court's application of federal constitutional harmless error doctrine, a federal court cannot grant a habeas petition simply if the state court erred in concluding the state court's errors were harmless; rather, habeas relief is appropriate only if the state court applied the harmless-error review in an objectively unreasonable manner.[3] "Objectively unreasonable" does not mean "'clear err," and the Ninth Circuit erred in applying the "clear error" standard to the state court decision. The "objectively unreasonable" application standard gives more deference to the state than would a "clear error" approach.

A state court decision is "contrary to" clearly established federal law for purposes of federal habeas if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are indistinguishable form a decision of the Supreme Court and nevertheless arrives at a different result than the Supreme Court precedent.[4]  A state court is not required to cite Supreme Court cases, or even be aware of them, to avoid its decision

---

[2] <u>Price v. Vincent</u>, 538 U.S. 634 (2003),  <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003).
[3] <u>See</u> <u>Mitchell v. Esparza</u>, 540 U.S. 12 (2003)
[4] <u>See</u> <u>Price v. Vincent</u>, 538 U.S. 634 (2003), <u>Early v. Packer</u>, 538 U.S. 3 (2003).

being "contrary to" Supreme Court precedent. As long as neither the result nor the reasoning of a state-court decision contradicts Supreme Court cases, federal habeas relief is inappropriate.[5]

The Supreme Court reaffirmed that § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. The Court said that the "contrary to" clause applies if a state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. Relief under the "unreasonable application" clause is appropriate if the state court identifies the correct governing legal principle, but unreasonably applies it to the facts. The application must be objectively unreasonable, which is different from being incorrect.[6]

---

[5] Early v. Packer, *supra*.
[6] Bell v. Cone, 535 U.S. 685 (2002)

## GROUND ONE

### TRIAL COURT DENIED PETITIONER THE RIGHT TO PRESENT A DEFENSE AND A FAIR TRIAL WHEN IT REFUSED TO PERMIT DEFENSE COUNSEL TO PROVE THAT THE COMPLAINANT INITIALLY TOLD THE POLICE A DIFFERENT VERSION OF THE INCIDENT.

Shortly after the alleged incident, a police officer interviewed the complainant. The complainant made no claim that she had been raped or burned, and affirmatively gave a different account of the alleged incident, than the version given at trial. Although the police report containing a prior inconsistent statement was admissible as a business record, the court ruled that the report was inadmissible hearsay. The state court's ruling, allowed the prosecutor to take unfair advantage during his closing remarks, and denied petitioner significant impeachment evidence in this case that revolved around the jury's resolution of a one-on-one credibility contest.

The decision to not allow petitioner to present evidence of a prior inconsistent statement denied petitioner the right to present a defense, and was an "unreasonable application" of clearly established Supreme Court precedent. The state court's determination was "objectively unreasonable". [7]

The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right supported by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.[8] It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining

---

[7] Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001).
[8] See Taylor v .Illinois, 484 U.S. 400, 408-409(1988); California v. Trombetta, 467 U.S. 479, 486 n. 6 (1984); Chambers v. Mississippi, 410 U.S. 284, 294 (1973).

14

process.'[9] "Few rights are more fundamental than that of an accused to present witnesses in his own defense."[10] The right is not unlimited; the defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability."[11] "Erroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right" to present a meaningful defense.[12] Nevertheless, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness. In Chambers, for example, the Supreme Court found that the state court's refusal to allow hearsay statements to be admitted as declarations against penal interest rose to the level of constitutional error, even though at the time many state courts as well as the federal system did not recognize that exception to the hearsay rule.[13].

[W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends on whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard of Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993)

In analyzing the reasonableness of a trial court's exclusion of evidence, a court must examine the stated reasons for the exclusion and "inquire into the possible state evidentiary law errors" that may have deprived the petitioner of a fair trial."[14]

---

[9] Dutton v. Evans, 400 U.S. 74, 89; Bruton v. United States, 391 U.S. 123, 135-137
[10] Chambers, 410 at 302, 93 S.Ct. 1038 (citing, inter alia, Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351 [1972)].
[11] Id. see also Taylor, 484 U.S. at 410, 108 S.Ct. 646 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.")
[12] Agard v. Portuondo, 117 F.3d 696, 705 (2d Cir. 1997).
[13] See Chambers, 410 U.S. at 299-302
[14] Jones, 229 F.3d at 120; see also Agard, 117 F.3d at 704

The state court unreasonably applied Supreme Court precedent when it permitted complete preclusion of out-of-court declarations that would have not only established petitioner's innocence but would have effectively cross-examined the complaining witness. Petitioner urges this Court to agree with him, and hold that the state court decision to preclude evidence of a prior inconsistent statement was an "objectively unreasonable" application of clearly established Supreme Court law.

The State Appellate Court held that "the [petitioner] was not prejudiced by any error in declining to admit the report since he had the opportunity to call the jury's attention to the inconsistency."[15]

Although out-of-court declarations constitute hearsay, they are admissible under the business record exception to the hearsay rule if they are made in the regular course of business. "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of the act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. [...] All other circumstances of the making of the memorandum or record, including lack of personal knowledge by the maker, may be proved to affect its weight, but they shall not affect its admissibility."[16]

The foundation supporting the admission of business records into evidence was unquestionably met in the instant case, as it is self-evident that the business of the Police

---

[15] People v. Gentile, 73 A.D.3d 944, 945 (2d Dept. 2010).
[16] McKinney's Civil Practice Law and Rules § 4518

Department is to investigate crimes and interview witnesses. Therefore, the police report [UF-61] was admissible as a business record.   As such, trial courts ruling that the police report was inadmissible hearsay was error, and thus denied petitioner of his right of due process, to present a defense, and to a fair trial.

## GROUND TWO

### PROSECUTORIAL MISCONDUCT PERMATED PETITIONER'S TRIAL DENYING A FAIR TRIAL.

Denied petitioner a fair trial by impugning defense counsel's integrity, mischaracterizing the evidence, expressing his opinion that petitioner's testimony was false, arguing that petitioner had tailored his testimony, vouching for the credibility of his own witness and thus, becoming an unsworn witness, and attacking petitioner's lifestyle and compelling him to characterize the people's witnesses as "liars."

Prosecutor's misconduct was violation of Amendment XIV rights to due process and a fair trial.

The fundamental question [...] is whether the prosecutor's misconduct caused substantial prejudice to the petitioner, thereby depriving [him] of a fair trial. In measuring whether substantial prejudice occurred as a result of prosecutorial misconduct, one must look into the severity and frequency of the conduct, whether court took appropriate action to dilute effect of conduct, and whether review of evidence indicates that without conduct same result would undoubtedly have been reached.[17] A prosecutor functions not only as an advocate to secure convictions, but also as a public officer with an obligation to see that justice is done, and that guilt shall not escape nor innocence suffer. He also owes a duty of fair dealing to the accused, which requires the exercise of impartial judgment and discretion.

The prosecutor in this case used inappropriate language, repeatedly impugned defense counsel's integrity, and grossly mischaracterized defense counsel's closing remarks and trial tactics. Explicitly asserting that defense counsel had used tactics deliberately designed to

---

[17] Berger v. United States, 295 U.S. 78, 88; United States v. Modica, 663 F.2d 1173, 1181

18

"distract [the jury] from the evidence," the prosecutor mischaracterized defense counsel's summation comments, claiming that counsel had argued that Vashti was a "stripper" who was, not only to blame for what had occurred to her, but did not deserve to be "protected under the law."

Prosecutor also improperly implied that defense counsel argued that because of her occupation, Vashti deserved to be raped, or blamed for her own alleged victimization. Prosecutor further improperly implied that defense counsel characterized Vashti as a "vindictive bitch" and a "faithless slut" who cried "crocodile tears" in court. Suggesting that defense counsel harbored a negative bias against women, the assistant also, sarcastically, asked, "How many times did Vashti Persad want to get [petitioner], how many times did she have to burn herself?"

A prosecutor may not state or allude to any matter that [he or she] does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or ask any question that [he or she] has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.[18] A Prosecutor, also, cannot support his case by his own veracity and position; rather, he must rely only upon facts and evidence. A prosecutor may neither mischaracterize, either the defense theory or, defense counsel's closing remarks, nor impugn defense counsel's integrity.

Prosecutor revealed his own opinion that petitioner was a liar who gave "self-serving" testimony, which the prosecutor claimed stood in stark contrast to Vashti's "truthful" testimony. Prosecutor also argued that defense counsel had argued that People's witness had lied to the jury. Although the court sustained defense counsel's objection, the prosecutor then argued, over objection, "Defense counsel wants you to believe that the NYPD is incapable of making

---

[18] 22 N.Y.C.R.R. § 1200.0 Rule 3.4(d)(1),(2), (4)

19

mistakes, but perfectly capable of coming up here, conspiring with witnesses and committing perjury to you under oath."

A prosecutor may neither characterize a petitioner as a liar, nor express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence.[19] He may not assert a personal opinion as to the justness of a cause, the credibility of a witness, [or] the guilt or innocence of an accused.[20]

In resorting to name calling and stating that petitioner and attorney are "liar[s]," or attempting to mislead the jury, a prosecutor exceeds the bounds of legitimate advocacy.[21] Such conduct is critical to the outcome of a criminal proceeding, highly prejudicial, and a violation of prosecutor's obligation to seek justice rather than a conviction.

Prosecutor, implying that petitioner had tailored his own testimony, reminded the jury that complainant was the "first person to testify," which he urged the jury, "above all" else not to forget during its deliberations. He explicitly told the jury that petitioner's presence during the trial gave him a unique opportunity to "tailor his testimony to fit the evidence in an attempt to escape responsibility."

Later in the instant case, the prosecutor hammered home his tailored testimony theme, repeating his argument that petitioner had tailored his testimony after hearing all of the people's witnesses and seeing the people's physical evidence. He argued that petitioner's testimony that Vashti's back was against the washing machine when they had consensual sex was tailored to conform to the photographs showing linear bruises on her back.

---

[19] People v. Bailey, 58 N.Y.2d 272, 460 N.Y.S.2d 912 (N.Y. 1983)
[20] 22 N.Y.C.R.R. § 1200.0 Rule 3.4(d)(3)
[21] People v. Shanis, 20 N.Y.2d 266, 282 N.Y.S.2d 519 (N.Y. 1975)

A prosecutor may not state or allude to any matter that [...] will not be supported by admissible evidence.[22] "A petitioner's presence at trial is not only required by the Confrontation and Due Process Clauses of the Federal and State Constitutions but also by New York Criminal Procedure Law, which provides that a "petitioner must be personally present during the trial of an indictment."[23] In addition, due process requires that a petitioner be present 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.[24]

During the People's summation, the prosecutor, continuously vouched for the credibility of prosecution witnesses, and expressed his personal beliefs regarding petitioner's testimony, with statements such as, "All the credible evidence in this case, *with the exception of the self-serving testimony of the petitioner*, corroborates what [Vashti Persad] said."(T.T. p. 737) He also stated that Veera and Brian Persad were "incapable of either developing or carrying out some sort of conspiracy to lie." (T.T. p. 755)

The prosecutor further went on to attack petitioner's credibility while vouching for the prosecution witnesses, stating, "Heard no evidence of Vashti Persad ever being convicted of a crime. Or her mother, or her brother or her sister." (T.T. p. 741)

A prosecutor may not vouch for the credibility of the People's witnesses. The prosecutor may not inject his own credibility into the trial, nor express his personal belief on matters that may influence the jury.[25]

During cross-examination of petitioner, the prosecutor attacked petitioner's lifestyle and character for permitting a young man to use drugs in his house. Prosecutor also repeatedly

---

[22] 22 N.Y.C.R.R. § 1200.0 Rule 3.4(d)(1)
[23] U.S. Const. 6th, 14th Amends; N.Y. Const., Art. I § 6; See also, C.P.L. § 260.20
[24] See, Snyder v. Commonwealth of Massachusetts, 291 U.S. 97 (U.S. Mass. 1934)
[25] People v. Paperno, 54 N.Y.2d 294, 445 N.Y.S.2d 119 (N.Y. 1981); People v. Bailey, 58 N.Y.2d 272, 460 N.Y.S.2d 912 (N.Y. 1983)

21

compelled petitioner, over objection, to testify that Vashti, her siblings, and the police witnesses had "lied" during their trial testimony.

Extrinsic evidence is relevant if it has any "tendency in reason to prove a material fact."[26] Because juries may attribute too much significance to it, it is usually excluded because it may 1) require a petitioner to meet a charge of which he had no notice; 2) raise collateral issues and direct the attention of the jury away from the crime charged; or 3) result in the proof of the [allegation] being taken by the jury as justifying a condemnation of the petitioner irrespective of his guilt of the offenses charged. Therefore, the rule is stated that if the only purpose of the evidence is to show bad character or propensity toward crime, it is *not* admissible.[27]

Prosecutor's remarks relating to petitioner permitting a young man to use drugs in his house held no probative value, and, as such, were nothing more than impermissible attacks.

A prosecutor may not ask questions that are designed to compel a petitioner to state that a complaining witness is a liar.[28] A petitioner has no burden to prove that a prosecution witness is lying. Any inference created to that effect merely deflects the juries' attention from the real issue of the sufficiency of the prosecutions evidence, and improperly shifts the burden of proof to the defense.[29]

Whether the petitioner believes that the prosecution witnesses lied under oath is irrelevant.

[26] Richardson, Evidence § 4, at 2, quoting from Uniform Rules of Evidence Rule 1[2]
[27] See, People v. Lewis, 69 N.Y.2d 321, 514 N.Y.S.2d 205 (N.Y. 1987),; People v. Alvino, 71 N.Y.2d 233, 525 N.Y.S.2d 7 (N.Y. 1981)
[28] People v. Delgado, 79 A.D.2d 976, 434 N.Y.S.2d 454 (2 Dept. 1981)
[29] People v. Ortiz, 207 A.D.2d 279, 615 N.Y.S.2d 387 (1st Dept. 1994)

## GROUND THREE

## PETITIONER'S GUILT WAS NOT PROVEN BEYOND A REASONABLE DOUBT

The court charged the jury on criminal possession of a weapon in the fourth degree and unlawful possession of a loaded rifle or shotgun. The evidence was legally insufficient to prove either count.

Legally sufficient evidence, in the State of New York, is defined as "competent evidence which, if accepted as true, would establish every element of an offense charged and the petitioner's commission thereof; except that such evidence is not legally sufficient when corroboration required by law is absent."[30] "No conviction of an offense by verdict is valid unless based upon trial evidence which is legally sufficient and which establishes beyond a reasonable doubt every element of such offense and the petitioner's commission thereof."[31]

As to criminal possession of a weapon in the fourth degree, the court charged the jury that the People had to prove that on or about July 29, 2005, petitioner knowingly possessed a "dangerous instrument," the shotgun, with the intent to use it unlawfully against another. It defined dangerous instrument as one "which under the circumstances in which it is used is readily capable of death or other serious physical injury."

As to the count charging unlawful possession of a loaded rifle or shotgun, the court charged that this count also required proof that the shotgun was loaded on or about July 29, 2005, and that appellant did not have a valid license or permit to possess the shotgun.

The police found the shotgun in appellant's home on August 1, 2005. Although it was inoperable and loaded when recovered, there was no evidence that it was loaded three days earlier,

---

[30] C.P.L. § 70.10[1]
[31] C.P.L. § 70.20

23

when either appellant or DiPiano possessed it. Therefore, the evidence was legally insufficient to prove appellant guilty of criminal possession of a weapon in the fourth degree or unlawful possession of a loaded rifle or shotgun. The People also failed to prove that appellant did not have a valid permit or license to possess the shotgun.

24

## GROUND FOUR

**PETITIONER WAS DEPRIVED OF A FAIR TRIAL BY THE ADMISSION OF COMPLAINANT'S OUTCRY MADE LONG AFTER THE FIRST SUITABLE OPPORTUNITY, AND PRIOR CONSISTENT STATEMENTS LEADING TO PETITIONER'S PROMPT ARREST.**

Although the complainant waited days before she told anyone about the alleged crimes, the court permitted the prosecution, over objection, to elicit evidence of her belated outcry to her mother and her prior consistent statements made to the police. Petitioner contends that complainant, in fact, had a "motive to fabricate". The People did not elicit any evidence that the complainant's consistent statement to Police was made at a time prior to her motive to fabricate.

Additionally, improperly bolstering the complainant's claims, the prosecution elicited evidence that the police promptly arrested petitioner following complainant's statements to police. In a case that turned on the jury's assessment of the complainant's credibility, admission of such evidence deprived petitioner of his constitutional right to a fair trial.

According to the New York State Court of Appeals, only "prompt outcries" are admissible. An outcry is considered prompt only if made at the "first suitable opportunity."[32] Furthermore, only the facts of a complaint, not the accompanying details, may be elicited.[33]

The proponent may offer the contents of the victim's prompt complaint as evidence of its factual content, but only if it satisfies some other exception to the hearsay rule, such as those for excited utterances, spontaneous declarations, or statements offered to rebut a claim of recent fabrication.[34]

---

[32] People v. O'Sullivan, 104 N.Y. at 486
[33] People v. McDaniel, 81 N.Y.2d 10, 595 N.Y.S.2d 364 (N.Y. 1993)
[34] See, U.S. v. Simmons, 923 F.2d 934 (C.A.2 [N.Y.] 1991), Fed. Rules Evid. Rule 801(d)(1)(B). 28 U.S.C.A.

The contemporary rationale for permitting prompt outcry evidence is that some jurors would inevitably doubt the veracity of a victim who failed to promptly complain of a sexual assault, such conduct being "natural" for an "outraged female."[35]

In this case, complainant had numerous opportunities to make said outcry before she actually did so, including the very night of the alleged incident, but did not. Petitioner was arrested after complainant's statement to police that she had been raped. This statement was made subsequent to initial statement, three days earlier, wherein she made no allegation of rape.

Regarding the admission of prior consistent statements, they may be used to bolster trial testimony attacked as a recent fabrication, if the prior statement was made at a time when there was no motive to falsify.[36] Even when the witness' credibility is attacked by proof of inconsistent statements, the witness' credibility may not be supported by proof of consistent statements.[37]

Certain exceptions to the rule excluding prior consistent statements have been recognized. Where the testimony of the witness has been assailed as a "recent fabrication," proof of prior consistent statements of the witness, made at a time when there was no motive to falsify, may be received in order to repel the imputation.[38] In applying the exception, it is important to identify when the motive to fabricate arose.

---

[35] People v. McDaniel, supra
[36] People v. Branch , 34 A.D.2d 541, 309 N.Y.S.2d 247
[37] McLean, 69 N.Y.2d 426, 515 N.Y.S.2d 428 (N.Y. 1987)
[38] McDaniel, supra

## CONCLUSION

### THE PETITIONER SHOULD BE GRANTED WHERE PETITIONER'S INCARCERATION VIOLATES THE CONSTITUTION OF THE UNITED STATES

DATE: December 20, 2011

Respectfully submitted,

Joseph Gentile, pro se

27

December 20, 2011

Mr. Joseph Gentile # 07A0255
Eastern C.F.
P.O. Box 338
Napanoch, New York 12458-0338

Clerk of the Court
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 03 2012 ★
BROOKLYN OFFICE

Re: **Gentile v. Larkin**

Dear Clerk of the Court:

Please find enclosed on petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an application to proceed informa pauperis, and an affidavit of service upon this court, as well as check in the amount of five dollars for filing fees.

Please inform me of your receipt of these materials, as well as the judge who will be assigned to hear this petition.

I thank you in advance for your time and consideration of this matter.

Respectfully submitted,

Joseph J. Gentile Jr.

Joseph Gentile, <u>pro se</u>
Petitioner

Enclosures

CC: File

UNITED STATES DISTRICT COURT
_____ DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Joseph Gentile
                                    Petitioner,

        -against-

Roland Larkin
                                    Respondent.
-----------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 03 2012 ★

CERTIFICATE OF SERVICE
BROOKLYN OFFICE

_____

        Joseph Gentile petitioner *pro-se* declares under the penalties of perjury the following:

On December 21, 2011, I have served a copy of the attached: Petition for Habeas Corpus, In forma pauperis Application And Filing Fee of $ 5.00, and all supporting papers upon the following concerned parties:

Clerk of the Court
United States District Court
Eastern District
225 Cadman Plaza East
Brooklyn, N.Y. 11201

_____

_____

_____

By sealing the same in a properly addressed, postage pre-paid wrapper by depositing the same in a mailbox located within Eastern Correctional Facility, P.O. Box 338, Napanoch, New York 12458.

                              Respectfully Submitted,

                              Joseph J. Gentile

                              Petitioner *pro-se*
                              Joseph Gentile ·07A0255
                              Eastern NY Corr. Fac. Box 338
                              Napanoch, NY 12458-0338

Executed on 21 the day of December, 2011.